Filed 1/26/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JASON SELF et al., | A158632 |
| Plaintiffs and Appellants, | |
| v. | |
| CHER-AE HEIGHTS INDIAN COMMUNITY OF THE TRINIDAD RANCHERIA, | (Humboldt County Superior Court No. DR190353) |
| Defendant and Respondent. | |

The question in this case is whether sovereign immunity bars a quiet title action to establish a public easement for coastal access on property owned by an Indian tribe. We hold that the tribe's sovereign immunity bars the action. Congress has not abrogated tribal immunity for a suit to establish a public easement. The plaintiffs fail to persuade us that a common law exception to sovereign immunity for "immovable property" applies here. Consistent with decades of Supreme Court precedent, we defer to Congress to decide whether to impose such a limit, particularly given the importance of land acquisition to federal tribal policy. We affirm the trial court's dismissal of the suit.

## BACKGROUND

### A.

As " 'separate sovereigns pre-existing the Constitution,' " Indian tribes possess the " 'common-law immunity from suit traditionally enjoyed by sovereign powers.' " (*Michigan v. Bay Mills Indian Cmty.* (2014) 572 U.S. 782, 788 (*Bay Mills*).)  Tribes are domestic dependent nations subject to Congress's plenary authority.  (*Ibid.*)  Tribal immunity is part and parcel of Indian sovereignty and self-governance. (*Ibid.*)  It protects tribes from the financial burdens of defending against suits, encourages economic development and self-sufficiency, and furthers tribal self-governance.  (*People v. Miami Nation Enterprises* (2016) 2 Cal.5th 222, 235 (*Miami Nation*).)

Because it is a matter of federal law, tribal immunity is "not subject to diminution by the States." (*Bay Mills*, *supra*, 572 U.S. at p 789.)  Tribes enjoy immunity from suit regardless of whether their activities are commercial in nature or whether their activities take place on a reservation.  (*Id.* at p. 790; *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.* (1998) 523 U.S. 751, 758-760 (*Kiowa*).)  The United States Supreme Court has "time and again . . . dismissed any suit against a tribe absent congressional authorization (or a waiver)." (*Bay Mills*, *supra*, 572 U.S. at p. 789.)  In so doing, the court has deferred to Congress to determine the nature and limits of tribal immunity because it is Congress's job, not the courts', to weigh competing policies and create exceptions to tribal immunity.  (*Id.* at pp. 800-801.)

2

In short, tribal immunity is the rule, subject only to two exceptions: when a tribe has waived its immunity or Congress has authorized the suit.  (*Bay Mills*, *supra*, 572 U.S. at pp. 789-791.)

**B.**

Defendant Cher-Ae Heights Indian Community of the Trinidad Rancheria ("Tribe") is a federally recognized Indian tribe.  (See 84 Fed.Reg. 1200-01, 1201 (Feb. 1, 2019).)  It purchased the coastal property at issue in fee simple absolute.  The Tribe has applied to the federal Bureau of Indian Affairs ("Bureau") to take the property into trust for the benefit of the Tribe.  (See 25 U.S.C. § 5108.)  Some background on the administrative process is helpful to understanding the parties' arguments.[1]

As part of the trust acquisition process, federal law requires a review of the Tribe's title and sets forth a process for resolving title issues.  (See 25 C.F.R. § 151.13.)  If the federal government approves the Tribe's trust application, interested parties may appeal that decision.  (See 25 C.F.R. § 151.12(d); see also, e.g., *Crest-Dehesa-Granite Hills-Harbison Canyon Subregional Planning Group v. Acting Pacific*

---

[1] We take judicial notice of facts related to the process appearing in three documents attached to the Tribe's request to the trial court for judicial notice: (1) A December 21, 2019, letter from the Acting Regional Director of the Bureau to the Coastal Commission indicating that the proposed trust acquisition is consistent with the California Coastal Act; (2) a March 11, 2019, letter from the Coastal Commission to the Regional Director of the Bureau concurring with the Bureau's consistency determination; and (3) the Coastal Commission's Adopted Staff Report concerning the Bureau's consistency determination.  (See Evid. Code, § 452, subd. (c); see also *Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1225, fn. 6 [taking judicial notice of Coastal Commission determination and staff report].)

*Regional Director, Bureau of Indian Affairs* (IBIA 2015) 61 IBIA 208, 214-215 [remanding decision to take tribal property into trust due to failure to address adjacent property owners' concerns regarding easement rights].) Federal law also includes a mechanism for obtaining a right of way over tribal trust lands, with the consent of the tribe. (25 U.S.C. §§ 323, 324; 25 C.F.R. § 169.101.)

Because the Tribe's proposed trust acquisition involves coastal property, the federal Coastal Zone Management Act imposes additional requirements. Each federal agency whose activity affects a coastal zone must certify that the activity is consistent to the maximum extent practicable with the state's coastal management policies. (See 16 U.S.C. § 1456(c); see also 15 C.F.R. § 930.36.) The state may concur or object to the federal consistency determination as part of a public process. (16 U.S.C. § 1456(c)(3)(A); 15 C.F.R. §§ 930.35, 930.39, 930.41, 930.42, 930.43.)

Here, the Bureau determined the Tribe's proposal is consistent with state coastal policies, including public access requirements in the state Coastal Act. (See Pub. Resources Code, § 30210 ["maximum access … and recreational opportunities shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse"]; see also, e.g., Pub. Resources Code, §§ 30211, 30212, 30214.)

Our Coastal Commission—the agency primarily responsible for implementing the Coastal Act (see Pub. Resources Code, § 30330)— concurred with the Bureau's determination. After securing commitments from the Tribe to protect coastal access and coordinate

4

with the state on future development projects, the Commission concluded that the Tribe's proposal "would not interfere with the public's right to access the sea" and would be consistent with public access policies.

In the future, if the Tribe violates the state's coastal access policies, the Coastal Commission may request that the Bureau take appropriate remedial action. (See 15 C.F.R. § 930.45(b)(1); see also 16 U.S.C. § 1456(c)(3)(A) [requiring new consistency review for future development projects that require federal permits].)

## C.

According to the complaint, plaintiff Jason Self uses the Tribe's coastal property to access the beach for recreational purposes and for his kayaking business. Plaintiff Thomas Lindquist also uses the property to access the beach for recreation. They allege that the prior owner of the property dedicated a portion of it to public use, either expressly or impliedly, between 1967 and 1972. (See Civ. Code, § 1009, subd. (b) [limiting implied dedications of public easements to those established prior to March 4, 1972].) The complaint seeks to quiet title to a public easement for vehicle access and parking on the property.

Self and Lindquist do not allege that the Tribe has interfered with their coastal access or that it plans to do so. They worry that the Tribe *might* do so in the future, and they filed this case out of "an abundance of caution." Once the land is placed in trust, the federal government would hold title to it for the benefit of the Tribe. (See 25 U.S.C. § 5108.) The United States is immune to actions to quiet title to Indian trust land. (28 U.S.C. § 2409a(a).)

5

In the trial court, the Tribe entered a special appearance and, citing sovereign immunity, moved to quash service of process and to dismiss the complaint for lack of subject matter jurisdiction. The trial court granted the motion and dismissed the case with prejudice.[2]

## DISCUSSION

### A.

It is settled that an Indian tribe is immune to suit in the absence of waiver or congressional abrogation of the tribe's immunity. (*Bay Mills, supra*, 572 U.S. at pp. 788-790; *Kiowa, supra*, 523 U.S. at p. 754.) Self and Lindquist do not argue either exception applies here. Ordinarily, then, we must affirm the trial court's dismissal. (*Bay Mills, supra*, 572 U.S. at p. 791 ("Unless Congress has authorized Michigan's suit, our precedents demand that it be dismissed.")

Self and Lindquist argue that we should recognize an existing common law exception to sovereign immunity. They contend that, at common law, sovereigns such as states and foreign governments were not immune to property disputes, under the immovable property exception. The United States Supreme Court has never applied such an exception to a tribe and recently declined to decide the question in

---

[2] Self and Lindquist assert that the trial court abused its discretion in denying judicial notice of documents relating to gambling revenues of Indian tribes. We find no error in the court's conclusion that the materials are irrelevant. We deny as irrelevant Self and Lindquist's request that we take judicial notice of the same documents, as well as the Tribe's request for judicial notice of a Petition for Writ of Administrative Mandamus in Humboldt County Superior Court Case No. CV190327 and a 1997 report by the Advisory Council on California Indian Policy.

6

*Upper Skagit Indian Tribe v. Lundgren* (2018) __ U.S. __, __ [138 S.Ct. 1649, 1652] (*Upper Skagit*).)

We review the immunity issue de novo. (*Miami Nation*, *supra*, 2 Cal.5th at p. 250.)

**B.**

Self and Lindquist are correct that states and foreign sovereigns are not immune to suits regarding real property located outside of their territorial boundaries. We are not persuaded, however, that a common law exception extends to tribes or that we should depart from the standard practice of deferring to Congress to determine limits on tribal immunity.

**1.**

In *State of Georgia v. City of Chattanooga* (1924) 264 U.S. 472, 479-480 (*Chattanooga*), the Supreme Court held that when a state purchases real property in another state, it is not immune to suit over rights to the property. Georgia had purchased land for a railroad yard in Chattanooga, Tennessee. (*Id.* at p. 478.) It sued to enjoin the city from condemning a right of way though the property, arguing that it had never consented to suit in Tennessee courts. (*Id.* at p. 479.) The Supreme Court held Georgia's foray into the Tennessee railroad business was a private undertaking, not a sovereign one: "Having acquired land in another State for the purpose of using it in a private capacity, Georgia can claim no sovereign immunity or privilege in respect to its expropriation." (*Id.* at pp. 479-480.) "Land acquired by one State in another State is held subject to the laws of the latter and to all the incidents of private ownership." (*Id.* at p. 480.)

Simply because this rule applies to states, however, does not mean it also applies to tribes. The Supreme Court has "often noted . . . that the immunity possessed by Indian tribes is not coextensive with that of the States." (*Kiowa*, supra, 523 U.S. at p. 756.) Self and Lindquist acknowledge that, unlike tribal immunity, state sovereign immunity turns on the nature of the constitutional compact as informed by the Eleventh Amendment. (See *Franchise Tax Board of Cal. v. Hyatt* (2019) __ U.S. __, __ [139 S.Ct. 1485, 1497-1498].) Tribes, who were not parties to that compact, did not surrender any aspect of their sovereignty as part of the constitutional plan. (See *Bay Mills*, *supra*, 572 U.S. at pp. 789-790.) Tribes retain a "special brand of sovereignty," and both its nature and extent "rests in the hands of Congress." (*Id.*, at p. 800.)

Indeed, in contrast to *Chattanooga*, the Supreme Court has not limited tribal immunity to traditional sovereign activities, as opposed to private commercial ventures. In *Oklahoma Tax Commission v. Citizen Band of Potawatomi Indian Tribe of Oklahoma* (1991) 498 U.S. 505, 510 (*Potawatomi*), the Supreme Court rejected an argument that a tribe's off-reservation cigarette sales were too removed from the tribe's sovereign interests to be covered by tribal immunity. Instead the court deferred to Congress to make those kinds of judgments, pointing to Congress's policy objectives of promoting tribal self-governance, self-sufficiency, and economic development. (*Ibid*.) Land acquisition, moreover, has a far stronger nexus to tribes' sovereign interests than cigarette sales. As we explain below, after Indian tribes lost millions of acres of reservation land due to calamitous federal policies enacted in

the late 19th century, Congress made land acquisition a central feature of its tribal policy.

*Upper Skagit* does not help Self and Lindquist.  In his concurring opinion, Chief Justice Roberts stated that the immovable property rule applies to states (citing *Chattanooga*) but reserved the question of whether it applies to tribes.  (*Upper Skagit, supra*, __ U.S. at pp. __ [138 S.Ct. at pp. 1655-1656] (conc. opn. of Roberts, C.J.)).  Justice Thomas would have applied it to tribes but only found support for that position from Justice Alito.  (*Id.* at pp. __ [138 S.Ct. at pp. 1661-1663] (dis. opn. of Thomas, J.).)  The majority opinion does not reach the question.  (*Id.* at pp. 1653-1654.)

**2.**

Self and Lindquist fare no better with foreign sovereign immunity.  They note that Chief Justice Marshall's opinion in *The Schooner Exchange v. McFaddon* (1812) 11 U.S. 116 (*Schooner Exchange*) articulated a common law immovable property exception for foreign sovereigns, albeit in dicta.  (*Id.* at p. 145 ["A prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction; he may be considered as so far laying down the prince, and assuming the character of a private individual."].)  They also point to a statute: the Foreign Sovereign Immunities Act includes an exception for immovable property (28 U.S.C. 1605(a)(4)), which was intended to codify "an exception to sovereign immunity recognized by international practice." (*Permanent Mission of India to the United Nations v. City of New York* (2007) 551 U.S. 193, 200.)

Neither the dicta in *Schooner Exchange* nor the Foreign Sovereign Immunities Act establishes that a common law exception applies to foreign sovereigns. *Schooner Exchange* concerned a French warship, not real property; the court held that United States courts lack jurisdiction over the warship. (*Schooner Exchange*, *supra*, 11 U.S. at p. 147.) Thereafter, courts interpreted *Schooner Exchange* to establish "virtually absolute immunity" for foreign sovereigns. (*Verlinden B.V. v. Central Bank of Nigeria* (1983) 461 U.S. 480, 486 (*Verlinden B.V.*).) For the next 164 years, foreign sovereigns were generally immune to suit. (*Ibid.*) This was a matter of comity, rather than a constitutional restriction, and courts deferred to the executive branch (specifically, the State Department) when deciding whether to assert jurisdiction over a foreign sovereign. (*Id.* at pp. 486-487.) At least some of these cases involved real property owned by a foreign sovereign. (E.g., *Knocklong Corp. v. Kingdom of Afghanistan* (Nassau Cty. Ct. 1957) 167 N.Y.S.2d 285, 286-287 [granting motion to dismiss suit based on sovereign immunity of the Kingdom of Afghanistan, as " 'suggest[ed]' " by amicus curiae State Department, in an action challenging title to real property].) When this case-by-case practice proved problematic, Congress passed the Foreign Sovereign Immunities Act in 1976. (*Verlinden B.V.*, *supra*, 461 U.S. at pp. 487-488.) In short, the common law does not seem to have driven foreign sovereign immunity. Rather, the courts deferred to the political branches—first the executive branch and then Congress after the Foreign Sovereign Immunities Act.

Even if there were a common law exception to foreign sovereign immunity, Self and Lindquist do not explain why we should extend it to

10

tribes. Tribes are not foreign sovereigns; "the relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist nowhere else." (*Cherokee Nation v. Georgia* (1831) 30 U.S. 1, 16; see also *id.* at p. 18 [noting that Article III, section 8 of the United States Constitution refers separately to "foreign nations" and "the Indian tribes"].) The Supreme Court has rejected the notion that tribal sovereign immunity must be congruent with foreign sovereign immunity. (*Bay Mills*, *supra*, 572 U.S. at pp. 797-798.) Tribes enjoy immunity for commercial activities (*Kiowa*, *supra*, 523 U.S. at p. 758), notwithstanding the fact that Congress has denied it to foreign sovereigns. (28 U.S.C. § 1605(a)(2).) In fact, the Supreme Court has pointed to the Foreign Sovereign Immunities Act as an example of its deference to Congress on both foreign and tribal immunity: "In both fields, Congress is in a position to weigh and accommodate the competing policy concerns and reliance interests." (*Kiowa*, *supra*, 523 U.S. at p. 759.)

**3.**

Even assuming a common law exception applies to states and foreign sovereigns, there are at least three additional reasons counselling us to defer to Congress to decide whether it should apply to tribes.

**a.**

Deferring to Congress on tribal immunity has been the Supreme Court's standard practice for decades. The court has acknowledged that it has the authority to limit tribal immunity, but it has pointedly refused to impose limits, despite its own skepticism about the doctrine's merits and somewhat hazy origins. (*Kiowa*, *supra*, 523 U.S. at pp. 756-

11

757 [tribal immunity developed "almost by accident" and "with little analysis"]; *id.* at pp. 758-759.) Self and Lindquist recycle arguments that the Court has rejected in other cases: immunity could leave them with no effective judicial remedy (*Potawatomi, supra,* 498 U.S. at p. 514); tribal immunity should not be more broad than that of other sovereigns (see *Bay Mills, supra,* 572 U.S. at p. 800); tribes should not enjoy immunity for commercial activities. (E.g., *Potawatomi, supra,* 498 U.S. at p. 510.) For decades, the Supreme Court has set aside these and other concerns, treated tribal sovereign immunity as settled law, and deferred to Congress for the "simple reason[][that] it is fundamentally Congress's job, not ours, to determine whether or how to limit sovereign immunity." (*Bay Mills, supra,* 572 U.S. at p. 800.) We see no reason to depart from this practice.

### b.

We should also defer to Congress because supporting tribal land acquisition is a key feature of modern federal tribal policy, which Congress adopted after its prior policy divested tribes of millions of acres of land. Deference is particularly appropriate when Congress has been active in the subject matter at issue. (See *Bay Mills, supra,* 572 U.S. at pp. 802-803; *Kiowa, supra,* 523 U.S. at pp. 758-759.)

In the late 19th century, the federal government abandoned its policy of supporting Indian self-governance and control of Indian lands and instead adopted a policy "to extinguish tribal sovereignty, erase reservation boundaries, and force assimilation of Indians into the society at large." (*County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation* (1992) 502 U.S. 251, 253-254 (*County of Yakima*).) The Dawes Act of 1887 (24 Stat. 388) – "which empowered

12

the President to allot most tribal lands nationwide without the consent of the Indian nations involved" (*County of Yakima, supra,* 502 U.S. at p. 254) and permitted the sale to non-Indians of surplus lands located on Indian reservations – devastated tribes, aggravated their poverty, and resulted in 90 million acres of tribal land passing to non-Indians. (*Bay Mills, supra,* 572 U.S. at pp. 811-813 (conc. opn. of Sotomayor, J.).)

Congress abruptly ended this approach with the enactment of the Indian Reorganization Act (48 Stat. 984) in 1934 and returned to the policy of supporting tribal self-determination and self-governance. (*County of Yakima, supra,* 502 U.S. at p. 255.)  Given the massive loss of tribal lands in the preceding decades, Congress authorized the federal government to restore surplus lands to tribes.  (*Ibid.*)  Congress also authorized the government to acquire land both within and outside existing reservations "for the purpose of providing land for Indians." (48 Stat. 985; see 25 U.S.C. § 5108; *County of Yakima, supra,* 502 U.S. at p. 255.)  The same provision empowers the federal government to take land into trust for the benefit of a tribe, as the Tribe has requested here.  (See 25 U.S.C. § 5108.)  Federal regulations establish an administrative process for addressing title concerns when the Bureau takes land into trust (25 C.F.R. § 151.13) as well as for obtaining easements over trust lands (25 C.F.R. § 169.101; see also 25 U.S.C. §§ 323, 324).

The Indian Reorganization Act advances tribes' sovereign interests by helping them restore land they lost.  And regardless of whether a particular tribe lost land, tribal land acquisition generally advances Congress's goals of tribal self-sufficiency and economic development.  By authorizing the federal government to acquire land

13

outside of existing reservations in trust for the benefit of a tribe, the federal scheme implicitly recognizes that tribes may acquire land for sovereign purposes beyond the borders of a reservation. (See 25 U.S.C. § 5108; 25 C.F.R. § 151.3(a).) This further distinguishes tribal land acquisition from that of states and foreign sovereigns.

Decades after the enactment of the Indian Reorganization Act, Congress considered whether sovereign immunity should protect trust lands. In 1972, Congress waived the federal government's sovereign immunity in title disputes over real property under the Quiet Title Act. (28 U.S.C. § 2409a; see *Block v. North Dakota* (1983) 461 U.S. 273, 275-276.) But it retained immunity for property that the government holds in trust for Indian tribes. (28 U.S.C. § 2409a(a).) The Justice Department, which proposed the exception for Indian lands, observed that "Indians . . . have often surrendered claims to vast tracks of land" and proposed the exclusion because "[t]he Federal Government's trust responsibility for Indian lands is the result of solemn obligations entered into by the United States Government." (See H.R. Rep. No. 1539, 92d Cong., 2d Sess. (1972), reprinted in 1972 U.S. Code Cong. & Admin. News, pp. 4547, 4556-67, written testimony from Mitchell Melich, Solicitor, U.S. Dept. of Interior.) Congress adopted the exclusion notwithstanding testimony that title disputes arise on Indian lands just like they do on federal lands covered by the bill's waiver of immunity. (Dispute of Titles on Public Lands, Hearings before Sen. Com. on Interior and Insular Affairs, Subcom. on Public Lands, on Sen. No. 216, Sen. No. 579, and Sen. No. 721, 92nd Cong., 1st. Sess., at pp. 58-60 (Sept. 30, 1971), testimony of Thomas E. McKnight.)

14

Congress has also addressed the sovereign immunity of Indian tribes themselves in connection with tribal land. Just eight months after the Supreme Court issued its decision in *Upper Skagit*, *supra*, __ U.S. __ [138 S.Ct. 1649], Congress reaffirmed its approval of tribal immunity in the context of a statute that, among other things, authorizes Indian tribes to grant rights of way over their land for energy resource development. (Pub.L. No.115-325, Title I, §§ 103(a), 105(d) (Dec. 18, 2018) 132 Stat. 4447, 4454, codified at 25 U.S.C. § 3504(i) ["Nothing in this section waives the sovereign immunity of an Indian tribe."])

Further, Congress has abrogated tribal immunity in targeted circumstances involving disputes over property. For example, the Indian Depredation Act authorizes suits against tribes that seized or destroyed property without just cause or provocation. (See Act of Mar. 3, 1891, ch. 538, 26 Stat. 851; see also *Hamilton v. United States* (1907) 42 Ct.Cl. 282, 287 [dismissing case for lack of jurisdiction because Indian Depredation Act did not authorize suit where tribe took claimant's real property pursuant to tribal law].) A 1958 statute waives tribal immunity and authorized the Hopi or Navajo Tribes to "commence or defend" a quiet title action against one another or any other tribe with an interest in specified tribal lands that had been the subject of a long-running dispute. (See Act of July 22, 1958, Pub.L. No. 85-547, 72 Stat. 403; *Hamilton v. Nakai* (9th Cir. 1971) 453 F.2d 152, 158-159 [Indian tribes enjoyed sovereign immunity in quiet title suit absent waiver of immunity in Pub.L. No. 85-547]; see also Act of December 22, 1974, Pub.L. No. 93-531, § 8(a), 88 Stat. 1712, 1715 [either the Navajo or Hopi "tribe . . . is . . . hereby authorized to

15

commence or defend . . . an action against the other tribe and any other tribe . . ., for the purpose of . . . quieting title" to specified lands].)

This history weighs strongly in favor of deferring to Congress to weigh the relevant policy concerns of an immovable property rule in light of the government's solemn obligations to tribes, the importance of tribal land acquisition in federal policy, and Congress's practice of selectively addressing tribal immunity issues in property disputes.

**c.**

Finally, the facts of this case make it a poor vehicle for extending the immovable property rule to tribes.

As far as property disputes go, this is something of a non-event. We do not discount the public's interest in coastal access. But when considering adopting a common law rule that would broadly abrogate tribal immunity in a wide variety of property disputes, it is worth noting that Self and Lindquist do not claim an ownership interest in the property. They allege no injury. They are attempting to establish a public easement for coastal access based on their concern that, sometime after the federal government takes the property into trust, the Tribe might interfere with access. The concern is speculative. And, as this case illustrates, Congress has created a detailed process for protecting public interests such as coastal access. (See, e.g., 16 U.S.C. § 1456(c).) California worked with the Bureau and the Tribe in that process. The state secured assurances from the Tribe to preserve coastal access. It determined that access is adequately protected, and it has remedies if there are problems in the future.

16

We have considered Self and Lindquist's remaining arguments and find them to be without merit.[3]

## DISPOSITION

The judgment is affirmed.

---

[3] We are not persuaded by the Tribe's argument, embraced by our colleague, that federal law preempts state quiet title actions.  It is not enough that such actions could complicate the federal trust process. (See *Virginia Uranium, Inc. v. Warren* (2019) __ U.S. __, __, 139 S.Ct. 1894, 1901.)  The Tribe points to no constitutional text or federal statute that displaces or conflicts with state law.  (*Ibid.*)

_____

BURNS, J.

I concur:

_____

SIMONS, ACTING P.J.

A158632

Reardon, J., Concurring.

I concur in the judgment and write to outline a narrow, but important, distinction in my reasoning which reaches the same result as does the majority. In essence, the question undergirding this litigation is whether tribal sovereign immunity to litigation, as originally understood, includes an exception for the litigation of disputes over title to real (immovable) property or not. My view is that it does contain such an exception, which Congress may but has not eliminated. The majority reasons that it does not contain such an exception, though Congress could but has not added one.[1] Nonetheless, we agree on the importance of the tribal interests involved and the federal government's manifest policy to encourage the expansion of tribal property interests and, thereby, tribal self-sufficiency. Further, we agree that substantial deference is owed congressional action in this area.

However, I believe that, once a tribe petitions to bring land within federal trust, the nuanced scheme created by Congress for the consideration of such petitions preempts this litigation. By different routes, we reach the same result: plaintiffs' action was properly dismissed by the trial court.

Does the doctrine of tribal sovereign immunity act as a bar to a state court action to imply an easement over nonreservation real property owned by an Indian tribe? The plaintiffs, seeking to impose

---

[1] The majority cites to instances in which Congress has reinforced the notion of tribal sovereign immunity. (Maj. opn. *ante*, at pp. 12–16.) However, none of these pertain to nontrust land owned by a tribe within the territorial limits of another sovereign, as presented by these facts.

the easement on behalf of the public in general, would have us answer this question in the negative. They argue that, whatever the provenance and scope of tribal sovereign immunity, it does not pertain to immovable property. Consequently, they contend the doctrine does not bar an in rem action to impose an easement on property within the state of California.

The "immovable property exception" to *state* sovereign immunity was, in essence, recognized by the United States Supreme Court in *Georgia v. Chattanooga* (1924) 264 U.S. 472, 480. (*Upper Skagit Indian Tribe v. Lundgren* (2018) __U.S.__ [138 S.Ct. 1649, 1660] (dis. opn. of Thomas, J., joined by Alito, J.) (*Upper Skagit)*.) The immovable property exception to foreign nation sovereign immunity has been codified by Congress in the Foreign Sovereign Immunities Act of 1976 (FSIA). (28 U.S.C. § 1605(a)(4); *Permanent Mission of India to the UN v. City of New York* (2007) 551 U.S. 193, 200 [FSIA codified the " 'pre-existing' " immovable property exception to sovereign immunity].) However, recently, the high court declined to decide whether such an exception exists as to *tribal* sovereign immunity, instead remanding to the state court of Washington for determination of that issue in the first instance. (*Upper Skagit,* at pp. __ [138 S.Ct. at pp. 1653–1654].)

Justice Thomas dissented from the majority's determination not to rule on the question. (*Upper Skagit, supra,* __U.S.__ at pp.__ [138 S.Ct. at pp. 1656–1657].) He then went on, at length, to explain why he believed the immovable property exception applied to tribal sovereign immunity, as it does to other types of immunity. (*Id.* at pp. __ [138 S.Ct. at pp. 1657–1663].) His reasoning makes sense, and I adopt it here without full recitation.

Suffice to say, when one sovereign owns land of another sovereign, the second sovereign generally retains the authority to adjudicate disputes respecting that land, at least with regard to questions like the one before us over title. (*Upper Skagit, supra,* __U.S.__ at p. __ [138 S.Ct. at p. 1662] [" 'the title to, and the disposition of real property, must be exclusively subject to the laws of the country where it is situated' "].) Thus, the second sovereign's authority over issues of title to land within its boundaries supersedes the first sovereign's privilege to preclude a judicial challenge to the fact and scope of its ownership of that land.[2] Quite obviously, the tribe's assertion of sovereign immunity to suit would operate to undermine the very foundation of the state's sovereignty. Congress could endorse such a result, but it has not, either explicitly or implicitly.

The federal Constitution does not speak to Indian tribal immunity. (See *Kiowa Tribe of Oklahoma v. Manufacturing Techs.* (1998) 523 U.S. 751, 759.) Thus, whether its inherent scope is derived from common law or natural law, it does not derive from the Constitution. Congress with its plenary authority over Indian affairs could modify its scope and could presumably extend tribal immunity to immovable property. (*Michigan v. Bay Mills Indian Community* (2014) 572 U.S. 782, 788.) That decision would be a political one, necessarily accounting for the interests of the federal government, the tribes and

---

[2] As noted by the majority, tribes are different from states and foreign nations, and the scope of their sovereign immunity is not necessarily the same. Whether this is a principle of limitation or aggrandizement is not clear. That is, is tribal sovereign immunity inherently greater or less than that afforded to states and foreign nations? The answer may well be neither, just different.

the states.  Congress has not done so.  However, it has done something strikingly similar that, I believe, leads to the same result.

Pursuant to the Indian Reorganization Act of 1934 (25 U.S.C. § 5108), "The Secretary of the Interior is . . . authorized . . . to acquire . . . any interest in lands . . . for the purpose of providing land for Indians. [¶] . . . [¶]  Title to any lands or rights acquired . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation."  Such acquisitions are implemented according to 25 Code of Federal Regulations part 151.1 et seq. (2021), including a written request for approval of acquisition by the tribe (25 C.F.R. § 151.9 (2021)), and notification to the state and local governments affected of the request with an opportunity to respond (25 C.F.R. § 151.10 (2021)).

In evaluating requests, the Secretary of the Interior must consider, inter alia, the need of the tribe for additional land; the purposes for which the land will be used; if the land will be used for business purposes, the anticipated economic benefits; the location of the land relative to state boundaries and the tribe's reservation boundaries; the impact on state and local governments of the removal of the land from regulatory jurisdiction and tax rolls; and (importantly here) jurisdictional problems and potential conflicts of land use which may arise.  (25 C.F.R. §§ 151.10–151.11 (2021).)  The decision to grant or deny the request is subject to judicial and, in some instances, administrative review.  (25 C.F.R. § 151.12 (2021).)  Also, before approval, the Secretary of the Interior shall notify the applicant of any liens, encumbrances, or infirmities in title and *may* require their

4

elimination before approval, but *shall* require their removal if they render title to the land unmarketable.  (25 C.F.R. § 151.13(b) (2021).)

As noted in the majority opinion, where, as here, coastal land is involved, the Federal Coastal Zone Management Act of 1972 provides an additional layer of state input and public participation.  (16 U.S.C. § 1456, et seq.)  I need not repeat that thorough explication.  Suffice to say, the federal statutory construct is thorough and intricately balances various interests—federal, state, tribal and public.  It would seem contrary to that construct, once a tribe petitions to bring land within the trust, to permit the tribe to be subjected to all manner of state lawsuits relative to the land, at least as to questions of title.  Indeed, plaintiffs now seek to impose an encumbrance on the land—an encumbrance that could impede the granting of the tribe's petition.

As Justice O'Connor wrote:  "Our cases reveal a ' "trend . . . away from the idea of inherent Indian sovereignty as a[n independent] bar to state jurisdiction and toward reliance on federal pre-emption." ' [Citations.]  Yet considerations of tribal sovereignty, and the federal interests in promoting Indian self-governance and autonomy, if not of themselves sufficient to 'pre-empt' state regulation, nevertheless form an important backdrop against which the applicable treaties and federal statutes must be read.  [Citations.]  Accordingly, we have formulated a comprehensive pre-emption inquiry in the Indian law context which examines not only the congressional plan, but also 'the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.' "  (*Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering* (1986) 476 U.S. 877,

5

884; *Agua Caliente Band of Cahuilla Indians v. Superior Court* (2006) 40 Cal.4th 239, 248 [noting this trend].)

Here, the property in question was purchased by the tribe in 2000. However, the purported public access supporting the implication of an easement is alleged to have existed since at least 1967. Not until the tribe petitioned to have the land brought into trust did plaintiffs seek the declaration of an easement. I have noted the strong state interest in adjudicating issues of title to land within the state. Indeed, the state courts provide a forum for these plaintiffs, or anyone else, to bring an action to quiet title in an easement on the property.

However, once the tribe petitions to bring the land into trust, the tribe's interest in the acquisition of land—an interest shared by the federal government—comes to the fore. At that juncture, Congress has established a structure for the assertion and balancing of these various interests as it concerns questions of title. This seems to be a classic case of federal field preemption, precluding plaintiffs' suit.[3] Albeit, the field in question is a narrow one: where a tribe has petitioned to bring land within the federal trust. I recognize that Congress did not explicitly preempt state court actions such as this. But, preemption need not be explicit, as long as congressional intent is clear. (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc., supra*, 41 Cal.4th at pp. 936–940.) Congress has provided an alternative forum for plaintiffs, such as these, to be heard. That is, even without a declared easement, the plaintiffs' interest in continued

---

[3] Alternatively, the specific facts here raise the possibility of obstacle preemption. (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936–940.)

6

access will be considered.  The statutory scheme for tribal petitions contemplates the possibility of existing encumbrances.  However, to allow any number of potential parties to seek to impose encumbrances on the subject land once the petitioning process has begun is, to my mind, clearly against congressional intent.  On that basis, I would affirm the ruling below.

_____

Reardon, J.[*]

---

[*] Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Humboldt County Superior Court, Case No. DR190353

Trial Judge:  The Honorable Kelly L. Neel

J. Bryce Kenny for Plaintiffs and Appellants

Hobbs, Straus, Dean & Walker, Timothy C. Seward, for Respondent.

8